Filed 10/22/21  In re A.T. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.T., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. T.T., Defendant and Appellant. | E076758 (Super.Ct.No. J286358) OPINION |

APPEAL from the Superior Court of San Bernardino County.  Steven A. Mapes, Judge.  Affirmed.

Megan Turkat-Schirn, under appointment by the Court of Appeal, for Defendant and Appellant.

Michelle D. Blakemore, County Counsel, and Svetlana Kauper, Deputy County Counsel, for Plaintiff and Respondent.

1

## INTRODUCTION

Defendant and appellant T.T. (father) is the father of A.T. (hereinafter A.T. or the child). Father appeals from a juvenile court's interim order reducing his visits to once a week, supervised, prior to the contested six-month review hearing. We affirm.

## PROCEDURAL BACKGROUND

On August 24, 2020, the San Bernardino County Children and Family Services (CFS) filed a Welfare and Institutions Code[1] section 300 petition alleging that the child, who was two months old at the time, came within the provisions of subdivisions (a) (serious physical harm), (b) (failure to protect), and (j) (abuse of sibling). The petition alleged that both father and the child's mother D.T. (mother)[2] repeatedly struck the child's half sibling, J.T., with a belt, which resulted in her crying and experiencing pain, and that such conduct placed the child at risk of physical abuse.

The social worker filed a detention report stating that CFS received a referral alleging physical abuse and general neglect of J.T., who was 10 years old, by mother and her live-in boyfriend, father. The referral stated that while father's biological daughter, Al.T., was visiting, she heard J.T. "getting beat and crying all day." The referral further stated that, when J.T. breaks the house rules, she "gets beat." On one occasion, J.T. got a snack without permission, and mother and father "were heard taking turns hitting" her with a belt.

---

[1] All further statutory references will be made to the Welfare and Institutions Code unless otherwise noted.

[2] Mother is not a party to this appeal.

The social worker met with the family and was informed that father and mother (the parents) had lived together for three years. Mother reported that, since having A.T., J.T. frequently got into trouble and needed to be disciplined. Mother said that she disciplined her by sending her to her room and not allowing her to play with toys. She admitted that she spanked J.T. with a belt, on the bottom, over her clothing. Father stated he disciplined J.T. the same way. The social worker discussed appropriate discipline and the importance of father not using physical discipline with J.T. since she was not his biological daughter. The parents immediately responded that they were a family, and they would continue to discipline both children.

The social worker interviewed J.T. She appeared timid and nervous and assured the social worker multiple times that everything was okay in the home. She blamed herself for the current situation, saying it was her fault mother spanked her. She said she got in trouble for not "doing stuff right away," and said she had a difficult time following rules. J.T. confirmed that the parents disciplined her by hitting her on the bottom, over her clothing, and she denied seeing any marks or bruises.

The social worker also interviewed Al.T., who said she was spending two weeks in father's home and would hear the parents disciplining J.T. She said she could hear J.T. scream. She said she believed the parents were hitting J.T. with a belt, as she would observe J.T. come into the room to pick up the belt before she heard her screaming. Al.T. reported hearing J.T. get spankings more than once a day. She gave examples of house rules, including not going in the kitchen without permission and not stepping on the green

carpet that separated the kitchen and dining area from the living room. Al.T. denied ever seeing marks or bruises on J.T. after she was spanked.

The social worker recommended that the child and J.T. (the children) be detained in the home of the maternal grandparents, in the custody of CFS. She further recommended visitation supervised by the county agency or delegate, once a week for two hours.

The court held a detention hearing on August 25, 2020. Father requested that the caregivers be assessed to supervise visits since he wanted to visit more than once a week for two hours. Counsel for the children asked for there to be no contact between father and J.T., given the alleged abuse. Counsel stated, "So I don't know how they will facilitate multiple visits, whether it be at the CFS office or the grandmother's house, but I would ask for that separate visit." Thus, the court ordered father not to have contact with J.T., but said that order could be subject to change through counseling. It added, "And that may mean that the caregiver won't be able to supervise his visits. I mean, I suppose if the caregiver's protective, she might be able to supervise Mom's visits, but that could mean they couldn't visit together. It's too complicated to try to separate that out. And so in other words, Dad's visit with his daughter couldn't occur with the caregiver. So the simplest way is what [the child's counsel] said. If it is possible for Mom to have additional visits, and Dad's not there, I am okay with that." The court detained the children in the care of the maternal grandparents and ordered supervised visitation between father and the child, and mother and the children, to be one time a week for two

4

hours.[3]  It authorized CFS to increase the frequency and duration and delegate supervision.

*Jurisdiction/Disposition*

The social worker filed a jurisdiction/disposition report on September 10, 2020, recommending that the court find the serious physical harm allegation under section 300, subdivision (a), not true, but find true the allegation that the parents struck the child's half sibling, J.T., with a belt (b-3, j-3).  The social worker further recommended that the children be removed from the parents' custody and the parents be provided with reunification services.

The social worker interviewed father on September 5, 2020.  He said he had been in a relationship with mother for about three years and had lived with her for about eight months.  He considered J.T. to be his daughter and had been her primary caregiver since he and mother moved in together, because mother was often working or out of the home. As to discipline, father said he was clear about his expectations and would give four warnings, would send J.T. to her room, and, if those measures did not work, would give no more than two strikes with a "golfing" belt, over her clothing.  His understanding was that physical discipline was allowed as long as it did not bruise or injure a child.

The social worker opined that the prognosis for reunification with the parents was positive, based upon their willingness to engage in services.  Case plan services were discussed with them, including individual therapy, family therapy, and parenting

---

[3]  We note that this appeal does not concern J.T.

education classes. The social worker noted they had already initiated the parenting classes. It was recommended that only mother and J.T. engage in family therapy at first, as it appeared J.T. did not have a secure attachment to mother. The social worker recommended that father join the family therapy once there was positive progress. The social worker recommended the court find father to be the child's presumed father.

Regarding father's visitation, the social worker noted that at the detention hearing the court ordered supervised visitation between father and the child once a week for two hours, with authority to increase the frequency and duration. The social worker reported that supervised visitation was actually being scheduled for twice a week for two hours as of the writing of the report, with no reported issues or concerns. Visitation was arranged to be supervised by the maternal grandmother in the parents' home. The social worker recommended the court now order visitation between father and the child to be twice a week for two hours, unsupervised, with authority to increase to overnights and weekends and to determine the location, as long as no corporal punishment was used. The social worker additionally recommended that the no-contact order between father and J.T. be lifted, and authority be granted for father to join family therapy between mother and J.T., if or when appropriate.

As to mother's visitation, the court also previously ordered supervised visitation once a week, with authority to increase frequency and duration. Supervised visits were being scheduled twice a week for her, with no reported issues or concerns. The social worker reported that visitation had been arranged to be supervised by the maternal grandmother in her home. The social worker recommended that the court now order

visits twice a week, unsupervised, at the maternal grandmother's home, with the condition that no corporal punishment be used.

The court held a jurisdiction/disposition hearing on September 15, 2020. Both mother and father submitted on the petition. The court dismissed the allegation of serious physical harm, sustained the petition, and declared the children dependents of the court. County counsel requested the court to lift the no-contact order regarding father and J.T. for future purposes, such as conjoint therapy with mother, but not necessarily for visits. Counsel for the children confirmed and added that she was fine with future unsupervised visits with J.T. perhaps after counseling, but asked for "any further liberalization be in accordance with the standing order and to include progress reports." The court agreed and adopted the social worker's recommended findings and orders, which included unsupervised visits between father and the child, two times a week for two hours. The court set a six-month review hearing for March 15, 2021.

*Six-Month Status Review*

On March 8, 2021, the social worker filed a status review report, recommending that the children remain in their placement with the maternal grandparents and that reunification services be continued. The social worker reported that the parents continued to live together. She further reported that father completed his parenting program and individual counseling on December 8, 2020, but had not participated in family therapy due to J.T. needing to participate in her own counseling prior to participating in therapy with the parents. A new referral for additional individual counseling and parenting was initiated for father.

7

The social worker also reported that during that period the parents were ordered to have separate, unsupervised visits with the children. Specifically, mother was ordered to have unsupervised visits with them at the maternal grandparents' home twice a week for two hours, and father was ordered to have unsupervised visits just with the child twice a week for two hours. On February 23, 2021, the social worker asked father who picked the child up for his visits, and he said he and mother did. He stated that since they lived in the same house, he "shared his visiting time with her." The social worker reminded him that the visits were specifically for him to spend quality bonding time with the child, and mother had her own visitation schedule. Father told the social worker that it was his time, and he wanted to have mother there during his visits. The social worker commented that father was ignoring what the court ordered regarding their visitation schedules.

Since the visits were unsupervised, the social worker received information from the maternal grandmother about them. The grandmother reported that in the beginning, she used to take the child to father's place for his visits and pick her up afterward. Then, mother always picked up and dropped off the child for father's visits. Father occasionally came to pick up the child with her, but he never came inside. He just remained in the car. The social worker opined that mother was the one who was feeding the child, changing her diapers, and attending to her during father's visits, and that father was simply present for the visits.

Additionally, the maternal grandmother reported that on February 20, 2021, mother came to pick up the child for father's visit. When the maternal grandmother

8

opened the door, she saw father sitting in the passenger's side of the car, with J.T. sitting on his lap, talking to him. Upon realizing that the maternal grandmother saw them, J.T. immediately got off of his lap. Thus, the social worker recommended that the court continue the parents' services, and that visits return to being supervised for both parents.

The social worker further reported that the parents presented themselves well during their services but had not demonstrated that they benefitted from them. They felt that just using physical discipline was not a good enough reason to remove the children from their care, since they left no bruises or marks. The social worker specifically noted that father minimized his role in the abuse of J.T., as he pointed out that the abuse consisted of only two lashes and did not leave any marks or bruises.

Moreover, the social worker stated that even though the parents completed their services, neither of them considered issues concerning J.T.'s behavior and the possibility of her mental or emotional issues in order to understand how to appropriately discipline her. The social worker further noted that father had a history of depriving his previous live-in girlfriend's daughter of getting food from the refrigerator, and now the story seemed to be repeating itself with him punishing J.T. for getting food from the kitchen without permission. The social worker was also concerned because J.T. was blaming herself for CFS's involvement with the family, when she was, in fact, the victim.

The social worker filed an informational memorandum on March 15, 2021, and reported that she spoke with father on March 11, 2021, regarding the physical discipline used on J.T. He said he and mother had used the physical discipline only twice and had stopped two months prior to Al.T. coming to visit. Father denied using physical

9

discipline on J.T. while Al.T. was visiting. He said Al.T. heard J.T. screaming while she was having a temper tantrum, and that Al.T. just assumed J.T. was hit with a belt because J.T. told her she was. However, Al.T. never witnessed J.T. being hit by father or mother. The social worker asked father what he planned to do differently for future disciplining, and he said he would use the same approach that he and mother had been using, such as talking and time outs.

The court held a six-month review hearing on March 15, 2021. At the outset, the court asked if the parties were submitting on the continuation of services, and father's counsel asked to set the matter contested. He also asked for any records of the visits, even though they had been unsupervised. Counsel for the children was in agreement with the current recommendations and asked the court to make an interim order for supervised visits, based on information contained in the report and because the parents were violating the prior court order by visiting together. Father's counsel objected to making the visits supervised at that point. The court clarified that the children's counsel was asking for both parents' visits to be supervised, and he said yes since they were both in violation. Mother's counsel then objected, as well. The court ordered the following: "If parents become in compliance with the orders, maybe we can get back on track by the trial, but I will revert visits back to supervised once a week for two hours. Mother and father to visit separately unless there is progress in programs, and there is some sort of therapy the parents are involved in, and the social worker has time to investigate the safety of them visiting together. At which time, by standing orders, I would require that they notify Minors' counsel of the intent to let them visit together. So there'll be

10

authority for them to progress. They don't have to wait until May 24th as long as they do what they need to do. [¶] The Department needs to work with them because there is still family reunification services." The court then set the next hearing for May 24, 2021.

DISCUSSION

The Court Did Not Abuse its Discretion in Modifying the Visitation Order

Father argues the court abused is discretion in issuing the interim visitation order pending the May 24, 2021 hearing, thereby reverting his visits to being supervised, once a week, and ordering them to be separate from mother's visits. He contends the order was an abuse of discretion since there was no showing these restrictions were relevant or necessary to protect the child's well-being. He had been consistently visiting with her, with no reported concerns. He additionally claims that restricting his visits to one time of week deprived him of reasonable services. We see no abuse of discretion.

At the outset, we note respondent's argument that the interim order made prior to the contested section 366.21, subdivision (e), hearing set for May 24, 2021, was arguably an interlocutory order that "was not appealable until the court made the ultimate determination at the trial." In other words, respondent claims the appeal is premature. However, the court made the visitation order at issue at the six-month review hearing on March 15, 2021. At periodic review hearings under section 366.21, "the court has the statutory power to order that reunification services, including visitation, be offered, modified, continued, or, under narrowly limited circumstances, terminated." (*In re Natasha A.* (1996) 42 Cal.App.4th 28, 35.) A court's order, made after the dispositional

11

hearing, is appealable. (*Id. at pp.* 34-35.) As such, we will consider the merits of father's claim.

A. *Relevant Law*

"A disposition order granting reunification services must provide for visitation between a child and parent 'as frequent as possible, consistent with the well-being of the child.' " (*In re T.M.* (2016) 4 Cal.App.5th 1214, 1218 (*T.M.*); see § 362.1, subd. (a)(1)(A).) "[D]ependency law affords the juvenile court great discretion in deciding issues relating to parent-child visitation, which discretion we will not disturb on appeal unless the juvenile court has exceeded the bounds of reason." (*In re S.H.* (2011) 197 Cal.App.4th 1542, 1557-1558.) "The abuse of discretion standard warrants that we apply a very high degree of deference to the decision of the juvenile court." (*In re J.N.* (2006) 138 Cal.App.4th 450, 459.)

B. *The Court Did Not Abuse its Discretion*

The court has the authority and responsibility to define the rights of the parties to visitation. (*In re Jennifer G.* (1990) 221 Cal.App.3d 752, 757.) "The definition of such a right necessarily involves a balancing of the interests of the parent in visitation with the best interests of the child." (*Ibid.*) In balancing these interests, the court determines the frequency and length of visitation. (*Ibid.*) "The court may, of course, impose any other conditions or requirements to further define the right to visitation in light of the particular circumstances of the case before it." (*Ibid.*)

At the detention hearing on August 25, 2020, the court ordered there to be no contact between father and J.T. It also ordered supervised visitation between father and

12

the child once a week, and it authorized CFS to increase the frequency and duration. The court specified his visits were to be separate from mother's visits, in light of the no-contact order and the fact that father and mother lived together. At the jurisdiction/disposition hearing, the court changed the visitation order and ordered father's visits to be unsupervised, twice a week, and it set a six-month hearing for March 15, 2021. Subsequently, at the six-month review hearing, the children's counsel requested the court to revert the visitation order back to supervised visits, once a week.

The court properly exercised its discretion in changing the visitation order back to supervised visits since the record shows that father failed to comply with its orders. The court ordered there to be no contact between father and J.T. in light of the alleged abuse. Prior to the jurisdiction/disposition hearing, when CFS recommended the court change father's visits to be unsupervised, it also set forth the objectives of father's services, including showing his ability to supervise, guide, and correct the child, paying attention to her health, safety, and well-being, and being nurturing and supportive at visits. The record shows that the maternal grandmother initially dropped off the child at father's place and picked her up for father's visits. After she stopped dropping off the child, mother always picked up and dropped off the child for father's visits. If father did come with mother, he never came inside, but would just stay in the car. On one occasion when mother came to pick up the child, the maternal grandmother saw father sitting in the car with J.T. on his lap. Upon realizing the maternal grandmother saw them, J.T. immediately got off father's lap. Father was in clear violation of the court's no-contact

13

order.  The no-contact order was in place for J.T.'s protection and father's compliance with it was required.

Furthermore, father told the social worker that he and mother picked up the child for his visits.  When the social worker reminded him that his visits were specifically for him to spend time bonding with the child and that mother had her own visitation schedule, he said it was *his* time, and he wanted to have mother at his visits.  Although he said he "shared his visiting time with [mother]," the social worker believed that mother was the one feeding the child, changing her diapers, and tending to her needs.  He was simply present at his own visits.  The social worker appears to have speculated that mother was the one feeding the child and changing the diapers during father's visits but there is no evidence to support that conclusion.  Nevertheless, father's actions in having mother accompany him on his visits was yet another violation of the juvenile court's orders designed to protect the children and achieve the case objectives.

We note that, although father completed a parenting program and individual counseling, he did not appear to have fully benefitted from them.  He continued to minimize his role in the physical abuse of J.T., pointing out that he only gave her two lashes and she did not get any bruises.  Moreover, father did not think the abuse was a good enough reason to remove the child from his care.  Thus, the child was still at risk of similar harm, especially if the visits with father were unsupervised.

In view of father's complete disregard for the court's orders, his apparent failure to work on his objectives, and his continued rationalization and minimization of the abuse, we conclude the court properly exercised its discretion in reverting his visits back to

14

being supervised, once a week. He needed supervision to ensure compliance with the court's orders and to protect the well-being of the child. (See *T.M.*, *supra*, 4 Cal.App.5th at p. 1218.)

C. *The Court Did Not Make a Finding on the Reasonableness of Father's Services*

Father argues that the reduction of his visits deprived him of reasonable services and that the interim visitation order "should be reversed with a finding that [he] was not offered reasonable reunification services." As respondent points out, the court did not make a finding of reasonable services at the March 15, 2021 hearing, since father set the matter contested, and the court continued the hearing to May 24, 2021. Thus, there is no reasonable services finding to appeal. Moreover, it is not our role on appeal to make such finding. Rather, the juvenile court shall determine whether reasonable services have been provided. (See § 366.21, subd. (e)(8).)

In any event, father appears to be making the same argument that the court erred in reducing his visits to once a week, supervised, but just framed in terms of the order being unreasonable. He again argues that "insufficient evidence supported the order restricting [his] visits to once a week which was not as frequent as possible consistent with the child's well-being," and concludes that, "[a]s follows, the once a week visitation order did not constitute reasonable reunification services since there is no way for an infant to retain a meaningful bond with once a week for two hours visitation." As discussed *ante*, the court properly modified father's visitation in light of the circumstances. We note the

court gave CFS the authority to change the visits back if he and mother complied with the orders and made progress in therapy.  (See § B., *supra*.)

DISPOSITION

The juvenile court's order is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


FIELDS          
            J.


We concur:


RAMIREZ      
       P. J.


MILLER       
       J.